UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

BETTY A. MCBEE,

        Plaintiff,

v.                                                    ACTION NO.
                                                       2:04cv544

JO ANN B. BARNHART,
Commissioner of Social Security,

        Defendant.

**UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3) seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The Court recommends that the decision of the Commissioner be AFFIRMED.

**I. PROCEDURAL BACKGROUND**

On July 30, 2001, Betty A. McBee ("Ms. McBee") filed an application for disability insurance benefits and supplemental security income with the Department of Health and Human

Services of the Social Security Administration. (R. 46-48, 181-82).[1] She alleged an onset of disability as of January 15, 2000, due to rheumatoid arthritis. (R. 58). The Social Security Administration denied her application initially and on reconsideration. (R.32-36, 183-87).

Ms. McBee requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration which was held on October 10, 2003. (R. 188-206). She was represented by A. Andrew Ege, Jr., Esq. at the hearing, during which Ms. McBee and a vocational expert testified. (R. 188).

On October 28, 2003, the ALJ issued a decision (R. 14-21) finding Ms. McBee was not entitled to disability benefits because she was not under a "disability" as defined by the Social Security Act. (R. 21). The ALJ found Ms. McBee is capable of returning to her past work as an office manager. (R. 21). The Appeals Council of the Office of Hearings and Appeals of the Social Security Administration denied review of the ALJ's decision on August 2, 2004. (R. 4-6). This makes the ALJ's decision the "final decision" of the Commissioner subject to judicial review here, pursuant to 42 U.S.C. § 405(g).

Ms. McBee brought this action seeking review of the Commissioner's decision denying her claim for disability insurance benefits and supplemental security income. She filed a complaint on September 16, 2004, which the defendant answered on December 8, 2004. Ms. McBee filed a motion for summary judgment, or in the alternative, a motion to remand on February 4, 2005. Defendant filed a motion for summary judgment on March 22, 2005. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for decision based on the memoranda.

---

[1] "R." refers to the administrative record.

## II. FACTUAL BACKGROUND

Ms. McBee was a fifty-one year old woman at the time of the hearing in this matter. (R. 191). Born August 4, 1952, she is presently fifty-four years old. (R. 46). She graduated high school, and her past relevant work experience[2] includes work as an automobile salesperson, a bartender, a food services assistant manager, a retail salesperson, a grocery cashier and an office manager. (R. 192, 203). Ms. McBee has been diagnosed with fibromyalgia and degenerative disease.

### A. Medical Evidence in the Record

Dr. David Lorenzo examined Ms. McBee on September 12, 2000, at which time she complained of vaginal bleeding for one month and abdominal cramps, and was noted to have a history of rheumatoid arthritis and controlled asthma. (R. 127). She was described as being oriented in all spheres, ambulatory, and in no distress; exhibited no edema (swelling) in her extremities and no abnormalities in her hand joints; and had entirely normal findings on physical examination, with the exception of the vaginal bleeding for which a gynecological consultation was recommended.

Dr. Lorenzo noted on October 25, 2000, that her vaginal bleeding had been controlled, although laboratory tests indicated that Ms. McBee had anemia secondary to such bleeding. (R. 126). Ms. McBee had a Baker's cyst on the left knee. Ms. McBee was again described as being free of swelling and tenderness, ambulatory, oriented in all spheres, and in no acute distress.

During a follow-up examination six months later, Ms. McBee complained of right hand pain and stiffness of one weeks' duration, and of neck pain on flexion and rotation. (R. 125). Physical examination was otherwise entirely normal. Ms. McBee exhibited no swelling, had a good range

---

[2] Past relevant work experience is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. § 416.965(a); 20 C.F.R. § 404.1565(a).

of upper extremity motion, and was described as being in no distress.

On August 24, 2001, Ms. McBee complained of joint pain in her hands with stiffness in the morning. (R. 123). On October 5, 2001, she reported multiple joint pains with stiffness of her hands and knees. (R. 119). On January 7, 2002, Ms. McBee complained of joint pains in her hands, knees and back, especially during changes in the weather; however, Dr. Lorenzo observed that, "her joint pain is okay on exam today." (R. 117). On each of these three visits, following his examination, Dr. Lorenzo described Ms. McBee as being oriented in all spheres, ambulatory, in no distress, and as exhibiting no swelling, joint tenderness, or range of motion deficits. (R. 117, 119, 123).

With the exception of a one-time finding of "slight" shoulder tenderness (R. 149), Dr. Lorenzo's reports of April 9, 2002 (R. 116), August 12, 2002 (R. 149), October 11, 2002 (R. 148), January 7, 2003 (R. 146), and February 28, 2003 (R. 144), continued to indicate the absence of joint tenderness, swelling or other arthritis-related abnormalities, despite Ms. McBee's complaints of multiple joint pain. (R. 148-49). On October 11, 2002, Ms. McBee reported that prednisone "works better for her joint pain." (R. 148). She was advised to take that medication "only if her arthritis is bad," and was described as being "in no distress."

Contrary to his examination notes, in a form report entitled "Physician's Report: Arthritis - Physical Residual Functional Capacity Evaluation" and dated May 5, 2003, Dr. Lorenzo opined that "since 1986" Ms. McBee had exhibited swelling and a reduced range of motion and grip in her hands, and persistent joint pain, swelling, tenderness and stiffness involving multiple major joints. (R. 135-40). He noted a positive serologic test for rheumatoid factor. He found that during an eight-hour working day, Ms. McBee would need to walk around regularly, change positions, and take unscheduled breaks. Dr. Lorenzo reported that Ms. McBee was extremely limited in her ability to

bend and to use her hands and fingers; that her pain interfered constantly with her attention and concentration; and that she was likely to be absent from work more than four times monthly. Lastly, Dr. Lorenzo indicated that Ms. McBee could stand and walk for about two hours, and sit in excess of six hours, during an eight- hour working day, and that she did not need to lie down during the day or use a cane or other assistive device.

Dr. Lorenzo referred Ms. McBee to Dr. Walter Wallingford who examined Ms. McBee on May 23, 2003. (R. 160-164). Dr. Wallingford reported that Ms. McBee had no reflex, neurological or sensory abnormalities (R. 160), had full grip strength (R. 162), was alert and oriented in all spheres ("AO3"), and was in no acute distress ("NAD"). (R. 164). In a subsequent letter to Dr. Lorenzo dated July 2, 2003 (R. 168-169), Dr. Wallingford stated that the prior diagnosis of rheumatoid arthritis was "unsubstantiated" by laboratory testing which yielded normal results. Dr. Wallingford diagnosed fibromyalgia based upon Ms. McBee exhibiting eighteen out of eighteen positive "trigger points." Dr. Wallingford explained that eleven out of eighteen positive trigger points is consistent with fibromyalgia. He noted that Ms. McBee exhibited a full range of joint motion, normal muscle strength, no joint swelling, no reflex deficits, and normal results on straight leg raising. Normal results were apparent on an x-ray of Ms. McBee's right knee. (R. 178). Dr. Wallingford's contemporaneously prepared notes again indicated that Ms. McBee was alert and oriented in all spheres and in no acute distress, with a previously diagnosed hypertensive condition being characterized as "ok." (R. 170).

Following a return visit on September 5, 2003 (R. 174-175), Dr. Wallingford observed that Ms. McBee "may be better," and again noted that laboratory test results were normal, although Ms. McBee complained of pain in multiple joints. Ms. McBee continued to exhibit the normal physical

5

examination results, i.e., no joint swelling or reflex deficits, and normal range of motion and muscle strength. A bone scan taken September 11, 2003, revealed "increased intake in the knees and hands, most likely related to degenerative disease." (R. 176).

Dr. Wallingford completed a form report dated September 26, 2003, entitled "Physician's Report: Physical Residual Functional Capacity Evaluation." (R. 155-58). Similar to Dr. Lorenzo, Dr. Wallingford entered findings which contrasted sharply with his contemporaneous examination notes. (R.155-158). He cited the "tender points survey" as the only "clinical finding and objective sign" of Ms. McBee's impairment. He described Ms. McBee's degenerative joint disease as "mild," and indicated that there were no adverse side effects to her medications. Nevertheless, he opined that Ms. McBee would be required to lie down for two to four hours daily due to fatigue; stated that her pain would often interfere with her concentration and attention; alleged that she was required to utilize a cane, walk every ten minutes, change positions, and take approximately sixteen unscheduled breaks during an eight-hour working day; and contended that she was extremely limited in her ability to use her hands and fingers, incapable of bending, and likely to be absent from work more than four times monthly. Dr. Wallingford further indicated that Ms. McBee could stand and walk for less than two hours, and sit for at least six hours, during an eight-hour working day, and was capable of performing a low stress job. Id.

In assessments rendered on October 11, 2001, and July 2, 2002, two State Agency physicians, upon a full review of the medical and non-medical evidence in the record at that time, opined that Ms. McBee could perform a full range of work at the medium exertional level. (R.128-134).[3]

---

[3] Additional evidence was received after the State Agency physician's review. Accordingly, the ALJ assigned the State Agency physician's assessments no weight in his decision. (R. 19).

**B. Testimony in the Record**

Ms. McBee was last employed on January 15, 2000, when she was discharged after working six months of selling automobiles. (R. 192-93). She testified she was discharged because of her inability to fill out the paperwork due to pain in her hands, and her difficulty in staying on her feet all day. (R. 192-93, 200).

In a daily activities questionnaire, completed on August 26, 2001, Ms. McBee described her typical day as: getting up at 4:00 a.m. to make coffee and pack her husband's lunch, having coffee with her husband, making her bed, showering, getting dressed, exercising, watching news and doing housework, eating breakfast, working on a daily project such as laundry, sewing, ironing, organizing or a hobby, cooking dinner, watching television or doing something with her husband and daughter, and going to bed between 9:30 p.m. and 10:00 p.m. (R. 78, 85). She stated she left her home two or three times a week, and either walked or drove to do the following: go to the bank, grocery shop, visit with friends and relatives, and go to social meetings. (R. 78). She stated she prepared all meals for her family daily, cleaned the house daily, watched approximately four hours of television daily, read an hour or more several times a week, visited friends and relatives two or three times a week, and grocery shopped weekly. (R. 79-82). She stated she needed help cleaning the bathtub and shower, reaching high areas, carrying heavy objects, opening jars, cutting vegetables, and styling her hair. (R. 79-82). She tried to spend time doing hobbies everyday, which included sewing, needlework, handicrafts, jigsaw puzzles, and word puzzles. (R. 80). She stated she could no longer do woodworking because the vibration of power tools made her hands worse, and could no longer go on long hikes or bike rides, go hunting, or play sports. (R. 80-82). She testified that regardless of the task she was performing, she needed to take frequent breaks. (R. 79-82). Lastly, she reported

she was awakened several times during the night due to pain. (R. 82).

At the time of her hearing on October 10, 2003, Ms. McBee was living with her husband and two children, aged twenty-two and eleven. (R. 192). During her hearing, Ms. McBee indicated that her condition was getting progressively worse. (R. 200). In response to a question about how she spends her time, Ms. McBee testified she does crossword puzzles, drives short distances, and takes short walks. (R. 196). On good days, she does light housework (R. 195), and sewing. (R. 195). On bad days, she does not get dressed, usually stays in bed or sits in a recliner and watches television. (R. 199). Ms. McBee testified that from approximately 1987 to 1989, she worked for the YMCA as an office manager. (R. 204). She stated that she kept the books, did payroll, supervised six employees, and had the authority to hire and fire. (R. 204). She resigned from the job because she had been working seven days a week, and her health was suffering because they would not give her any time off. (R. 204).

The vocational expert also testified at the hearing, identifying the skill and exertional level of Ms. McBee's past relevant work. (R. 203-205). The vocational expert testified that work as an office manager would be a skilled, sedentary job. (R. 204-205). On cross-examination, the vocational expert testified that if a person's pain deprived him of the ability to concentrate and attend to the task, it would eliminate him from performing all jobs. (R. 205).

### III. ANALYSIS

The ALJ held that Ms. McBee was not under a disability within the meaning of the Social Security Act. The Court's review of this decision is limited to determining whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C.

§ 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. Richardson, 402 U.S. at 401.

Under Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984), a denial of benefits is not supported by substantial evidence if the ALJ "has not analyzed all evidence and . . . sufficiently explained the weight he has given to obviously probative exhibits." The issue before this Court, therefore, is not whether Ms. McBee is disabled, but whether the Commissioner's finding that Ms. McBee is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See id.

The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the

> inability to do any substantial gainful activity[4] by reason of any medically determinable physical or mental impairment[5] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment"[6] which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[7] 20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material

---

[4] "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; 20 C.F.R. § 416.910. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572.

[5] "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[6] The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c), 416.920(c).

[7] The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2. However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy. 20 C.F.R. § 416.920(f); § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 466 (1983); Social Security Ruling ("SSR") 83-10.

facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one or negative answers to questions two or four result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.

In this case, the ALJ addressed the first four phases of the five-step evaluation process to determine whether Ms. McBee is disabled within the meaning of the Social Security Act. The ALJ first determined that Ms. McBee has not engaged in substantial gainful activity since January 15, 2000. (R.15). The ALJ next found that Ms. McBee suffers from fibromyalgia and degenerative joint disease, which cause significant vocationally relevant limitations and would be regarded as "severe" under the relevant guidelines. (R. 15). However, at the next step of the sequential analysis, the ALJ found that Ms. McBee's impairments did not, even in combination, meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (or 20 C.F.R., Part 404, Subpart P, Appendix 1). (R. 15). Fourth, based on the ALJ's evaluation of the evidence, the ALJ determined Ms. McBee's residual functional capacity.[8] (R. 15-19). The ALJ found that the evidence and

---

[8] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing residual functional capacity,

testimony, as a whole, reflect that Ms. McBee retains the residual functional capacity to perform the full range of sedentary work. (R. 19). Consequently, the ALJ found Ms. McBee capable of performing her past relevant work as an office manager.

Ms. McBee argues that the Commissioner's decision is not supported by substantial evidence because the ALJ improperly ignored the treating physicians' opinions and substituted his own opinion for the medical evidence in the record.

### A. ALJ's Evaluation of the Medical Evidence

The ALJ performed an evaluation of the medical evidence in the record including the treatment notes of Dr. Lorenzo and Dr. Wallingford. (R. 17-19). Applicable regulations provide that a treating source's[9] opinion on issues regarding the nature and severity of an impairment should receive controlling weight if it is not inconsistent with other substantial evidence in the record and is well supported by medically-accepted clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1526(b); 404.1527(d)(2); 416.927(d)(2). In addition, the ALJ is required to explain the weight given to any of the medical opinions that bear on the issues in the case. 20 C.F.R.

---

> the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Id. (footnote omitted.)

[9]As defined in 20 C.F.R. § 404.1502 ". . . a treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."

§ 404.1527(f)(2)(ii). However, the Social Security Regulations specifically state that the final responsibility for deciding certain issues, such as whether the claimant is disabled, what the claimant's residual functional capacity is, or the application of vocational factors, is reserved to the Commissioner, and no special significance will be given to the treating source's opinion on these issues. 20 C.F.R. § 404.1527(e)(2), (3).

The ALJ summarized the treatment notes of Dr. Lorenzo and Dr. Wallingford. (R. 17-19). Due to the contrast between the treatment notes, and the form reports completed by each of these treating physicians, the ALJ found the opinions contained in the form reports were not entitled to any weight. (R. 18-19).

A review of the record reveals that the treating physicians' contemporaneously prepared treatment notes do not support the opinions reached in their form reports, and the ALJ was justified in his conclusion. Dr. Lorenzo's form indicates that since 1986, Ms. McBee's hands had exhibited swelling, tenderness, reduced grip, and a limited range of motion, imposing significant limitations on her manual dexterity. (R. 135-36, 139-40). In contrast, Dr. Lorenzo's examination notes report, without exception, a full range of motion. (R. 116, 117, 1129, 123, 125, 126, 127, 144, 146, 149). Further, the examination reports noted on only one occasion slight swelling in her hands, otherwise the notes report no swelling or tenderness in Ms. McBee's hands or upper extremities. (R. 116, 117, 119, 123, 125, 126, 127, 144, 146, 149). Next, Dr. Lorenzo reported Ms. McBee "constantly" experienced pain "severe enough to interfere with attention and concentration" (R. 138), despite uniformly finding during Ms. McBee's examinations that she was "in no distress" and fully oriented in all spheres. (R. 117, 119, 123, 125, 126, 127, 148, 149). Lastly, Dr. Lorenzo found Ms. McBee was significantly limited in her ability to bend, stand, and walk (R. 138-40), while his multiple

13

physical examinations of Ms. McBee yielded normal results. (R. 116, 117, 119, 123, 125, 127, 144, 146, 149).

A review of Dr. Wallingford's findings reveals a similar contrast between contemporaneous notes and subsequent findings on the form report. With the exception of his tender points test, which established the diagnosis of fibromyalgia (R. 169), and a bone-scan (R. 176) which indicated "mild" degenerative joint disease (R. 155), Dr. Wallingford's physical examinations of Ms. McBee yielded entirely normal results. (R. 168-69, 174-75). He described Ms. McBee as in no acute distress, alert and oriented in all spheres (R. 164, 166, 170, 172); having normal grip strength and normal muscle strength in her upper and lower extremities (R. 162, 168, 175); exhibiting no hand pain or joint swelling, no reflex, sensory or neurological, or straight leg raising abnormalities (R. 160, 168-69, 175), a full range of motion in her skeletal joints (R. 168, 175), no abnormalities on an extensive series of laboratory diagnostic tests (R. 168, 174) and a right knee x-ray (R. 178), and no adverse side effects from her prescribed medications (R. 156). Nonetheless, Dr. Wallingford found in his form report that Ms. McBee had significant upper and lower extremity restrictions, an extreme deficit in concentration, a need to walk every ten minutes, and a complete inability to ever lift even ten pounds (a contention which Ms. McBee contradicts during her hearing testimony (R. 157, 196)). (R. 155-58).

The ALJ explained that the form reports appeared to be based completely on Ms. McBee's subjective complaints, and were not substantiated by objective tests or examinations. (R. 18-19). Moreover, form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudicative process. See Crane v. Shalala, 76 F. 3d 251, 253 (9th Cir. 1996); Mason v. Shalala, 994 F. 2d 2058, 1065 (3d Cir. 1993); O'Leary v. Schwekier, 710 F.2d

14

1334, 1341 (8th Cir. 1993). The ALJ concluded:

> First, none of the claimant's treating physicians opined that she is totally disabled. Second, all of Ms. McBee's treatment modalities have been very conservative in nature (medications). Third, the claimant did not complain of any side effects from prescription medications that would adversely affect her ability to work. In fact, she testified that medications help her pain. Fourth, based on Ms. McBee's own testimony, she engaged in extensive activities of daily living, including sewing with a machine up to 1 hour per day, driving, shopping, and doing housework. She also stated that she is able to lift 10 pounds. These activities are totally inconsistent with her allegations of disabling limitations. Fifth, . . . , the claimant's treating physicians, Drs. Lorenzo and Wallingford opined that she is able to stand and/or walk approximately 2 hours out of an 8-hour workday, and sit for at least 6 hours. Sixth, while the claimant has been diagnosed with fibromyalgia and mild degenerative joint disease, the fibromyalgia appears to be subjective only. All laboratory reports are normal, and there are no other objective findings. Furthermore, at the hearing, the undersigned observed Ms. McBee to be in no distress. She was carrying a very large handbag over her left shoulder and using her arms and hands without difficulty.

(R. 19).

While the ALJ stated Ms. McBee's fibromyalgia was "subjective only," he accepted the diagnosis of fibromyalgia, and found it was "a severe impairment which was work-limiting." (R. 15). It is important to note that, as with other impairments, fibromyalgia is not disabling per se, but only to the extent that the functional limitations associated therewith render a claimant incapable of working. See Ray v. Apfel, 1999 WL 1267349 (4th Cir. 1999); Carr v. Sullivan, 1990 WL 171370 (4th Cir. 1990). The treating physician's treatment notes as well as Ms. McBee's reported daily activities support the ALJ's residual functional capacity finding.

The ALJ articulated specific justification for discounting the opinions of Dr. Lorenzo and Dr. Wallingford contained in their form reports, and this Court finds no reversible error.

15

### B. ALJ's Findings Regarding the Testimony

Ms. McBee contends the ALJ erred in failing to fully credit her subjective complaints of pain. Plaintiff's Memorandum p. 6. Ms. McBee testified that on a good day she can do some light housework, but needs to stop every thirty to forty-five minutes to rest for two to four hours. (R. 195). On good days she can sew for an hour or two. (R. 195). She testified she can drive short distances, walk a block, lift ten pounds and can sit for thirty minutes. (R. 196). She testified she experiences constant pain all over every day, and has headaches all the time, with her medications giving her some relief. (R. 197). She has bad days four or five days a week, and on those days she stays in bed or sits in a recliner. (R 199). On a scale from one to ten, with ten being "absolutely excruciating" pain, Ms. McBee testified her pain is an eight on a good day and a ten on a bad day. (R. 201).

The ALJ found Ms. McBee's testimony only partially credible. (R. 17). The existence of pain can constitute a disability if the pain is of such a debilitating degree that it prevents the claimant from engaging in substantial gainful activity. 20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(1)(A). The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig, 76 F.3d at 594 (citing 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A)). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Id. at 595 (citing 20 C.F.R. § 416.929(c)(1) and § 404.1529(c)(1)).

When evaluating the intensity and persistence of the claimant's pain, and the extent to which

it affects her ability to work, the ALJ must take into account not only the claimant's statements about the pain, but also

> all the available evidence, including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasm, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citing 20 C.F.R. §§ 416.929(c)(2), (c)(3) and 404.1529(c)(2), (c)(3)). The regulations make clear that "[o]bjective medical evidence ... such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption ... is a useful indicator to assist [] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

As discussed in the preceding section, the examination notes of Ms. McBee's treating physicians, dating from September 2000 through September of 2003, do not support Ms. McBee's allegations of disabling pain which causes her to be bed-ridden. Ms. McBee testified she sees her doctor about once a month. (R. 193). The examination notes from her doctor visits indicate Ms. McBee was alert and oriented in all spheres and in no distress (R. 117, 119, 123, 125, 126, 127, 148, 149, 164, 166, 170, 172), had a normal grip and full muscle strength in her upper and lower extremities (R. 162, 168, 175), had a full range of skeletal and upper extremity motion (R. 117, 119, 123, 125, 168, 175), exhibited no significant joint swelling or tenderness (R. 116, 117, 119, 123, 125, 126, 127, 144, 146, 149, 168, 175), had no neurological, reflex or sensory abnormalities (R.

160, 168-169, 175), and had normal findings on an extensive series of objective tests (R. 168, 169, 174, 175, 178).

Ms. McBee's own subjective statements of her symptoms "are not enough to establish that there is a physical [] impairment." 20 C.F.R. § 404.1528(a). The ALJ conducted a thorough review of the medical evidence and Ms. McBee's testimony in reaching his conclusion that during the relevant time period, she was capable of sedentary work. The ALJ committed no reversible error in his analysis.

There is significant evidence in the record to support the ALJ's finding and the Commissioner's decision that Ms. McBee is not disabled.

## IV. RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be AFFIRMED. Plaintiff's Motion for Summary Judgment, and in the alternative, Motion for Remand should be DISMISSED, and Defendant's Motion for Summary Judgment should be GRANTED.

## V. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal

Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

    2. A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

    The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

                                      /s/
                                Tommy E. Miller
                                United States Magistrate Judge

Norfolk, Virginia

July 18, 2005

## **CLERK'S MAILING CERTIFICATE**

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

A. Andrew Ege, Jr., Esq.
Hudgins & Ege, P.C.
1100 Laskin Road
Suite 100
Virginia Beach, VA 23451


Mark A. Exley, Esq.
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, VA  23510


                Elizabeth H. Paret, Clerk


              By _____
                Deputy Clerk

                July  , 2005